## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**GERALD KALLAUS,** *et al.***,**

      **Plaintiffs,**

**-v-**
                           **Case No.:  2:09-CV-0899**
                           **JUDGE SMITH**
                           **Magistrate Judge Abel**

**NATIONWIDE DEATH BENEFIT
PLAN,** *et al.***,**

      **Defendants.**

### OPINION AND ORDER

      Plaintiffs, Gerald and Anne Kallaus, the parents of Bradley Kallaus, initiated this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, seeking accidental death benefits under the terms of the Nationwide Death Benefit Plan (the "Plan"). This matter is before the Court on Defendants Nationwide Death Benefit Plan and Nationwide Life Insurance Company's Motion for Judgment on the Administrative Record (Doc. 33), and Plaintiffs' Motion for Judgment on the Administrative Record (Doc. 35). These motions have been fully briefed and are now ripe for review. For the reasons that follow,  Plaintiffs' Motion for Judgment on the Administrative Record is **DENIED** and Defendants' Motion for Judgment on the Administrative Record is **GRANTED**.

## I.     BACKGROUND

Bradley Kallaus was employed by Nationwide Mutual Insurance Company ("Nationwide") as a 401(k) plan liason.  Bradley Kallaus was a participant in the Plan and the corresponding Group Accident Insurance Policy (the "Policy").  Bradley Kallaus died on September 20, 2008.  Plaintiffs, Bradley's parents, assert that Bradley's death was an accident, due to a medication error, and therefore seek the benefits under the Plan.  Defendants denied Plaintiffs' claim based on exclusions under the policy.

### A.     Bradley Kallaus's Medical History

Bradley Kallaus had a history of depression dating back to the late 1990s. (AR 63, AR 178-179).  As far back as September 21, 2004, Kallaus' physician, Dr. Robert Herbert, prescribed Kallaus with Lexapro, a drug used to treat depression.  (AR 191).  On May 3, 2007, Kallaus reported that the Lexapro was not working.  (AR 179).  Dr. Herbert switched him to duloxetine, known commonly by its trade name Cymbalta, a prescription medication similarly used to treat depression.  (AR 179, AR 182).  Kallaus' depression was of such significance that Kallaus discussed it with Dr. Herbert during almost every one of their medical consultations.  (AR 178-179, AR 182-186, AR 191).

Bradley Kallaus also had a history of alcohol use dating back to his adolescence.  He reported that he started using alcohol daily when he got divorced in 1999.  (AR 46-47, AR 57).  He described that he drank "a 6 to a 12-pack per day" until around 2003, and then started "having a 12-pack per night." (AR 246).  Kallaus' doctors repeatedly told him to stop using alcohol.  (AR 178-180, AR 191, AR 204, AR 212-213).  Kallaus indicated he "continued [to] use [alcohol] despite [a] verbalized desire to stop," and that he believed he was using alcohol to medicate his

symptoms of depression.  *Id.*  In filling out a Substance Dependency Assessment for The Ohio

State University, Kallaus said "drinking is one of the only things I enjoy anymore." (AR 48).  On

August 18, 2007, Kallaus was admitted to Talbot Hall at The Ohio State University Medical

Center for inpatient treatment for alcohol dependency.  (AR 69, AR 98).  He remained in

inpatient treatment at Talbot Hall for four days and was discharged on August 22, 2007.  (AR 98).

He then underwent 18 additional sessions of intensive outpatient therapy over a six-week period.

(AR 78-93).  However, by February 2008, Kallaus had begun drinking alcohol again.  Dr.

Herbert's notes throughout 2008 reflect that Kallaus' alcohol use had increased and that Dr.

Herbert was again regularly advising Kallaus to stop using alcohol.  (AR 182-185).

 Bradley Kallaus developed liver problems as a result of the alcohol abuse.  He had a

chronic elevation of liver enzymes, indicating inflammation and damage to the cells of his liver.

(AR 212).  After some blood work in April 2003, Kallaus' physician wrote: "liver test indicating

probable liver injury from alcohol."  (AR 187).  After more testing again in November 2005, and

May 2007, Kallaus' liver enzymes were again reported to be "elevated." (AR 175, AR 199).

 Bradley Kallaus also suffered from heart problems, including heart disease, hypertension,

and high blood pressure.  (AR 63).  Kallaus' family had a history of coronary artery disease, a

narrowing of the arteries that causes reduced blood flow to the heart.  (AR 209).  On December

19, 2005, Kallaus was seen at the emergency room at Grant Medical Center complaining of

shortness of breath and chest pains that "[were] so severe that he felt that he could pass out."  (AR

209).  On August 16, 2006, Dr. Herbert prescribed Kallaus with Lisinopril, a drug used to

treat hypertension and high blood pressure, as well as reduce the risk of heart attack. (AR 205).

Kallaus continued to use Lisinopril until his death in 2008.  (AR 26-27, AR 38-39).

On October 9, 2007, Kallaus was diagnosed with upper extremity "paresthesias and weakness," a numbness or tingling of his arms and fingers.  Kallaus refused the nerve conduction study and electromyography his physician had recommended. (AR 172-177).  Just months later, on February 7, 2008, Kallaus was again diagnosed with chest pain, heart palpitations, and tachycardia.  (AR 173, AR 182).

**B.     Bradley Kallaus's Death**

Bradley Kallaus was last heard from in the late afternoon or early evening of September 20, 2008.  (AR 257).  After no one was able to reach Kallaus over the next two days, one of Kallaus' family members went to his home on September 22, 2008, and discovered him deceased in his bed.  (AR 257).  The Pataskala Police Department and the West Licking Fire Department responded.  Kallaus was examined and when no detectable heart rhythm was found, he was pronounced dead.  (AR 283).  The Licking County Coroner's Office was called and Chief Forensic Pathologist, C. Jeff Lee, D.O. ("Dr. Lee") was dispatched to the scene.  (AR 257).  His office transported Kallaus' body to the morgue, where an autopsy was performed the following afternoon. (AR 257).  Dr. Lee performed the autopsy on Kallaus' body. (AR 290-292).  The results of the autopsy showed that Kallaus had suffered a "myocardial infarct" (a heart attack) as little as four hours before his death.  (AR 291).  Kallaus' liver showed severe microsteatosis and macrosteatosis, more commonly referred to as fatty liver.  (AR 292).  And his right kidney showed signs of acute tubulitis, an infection in the cells of the kidneys.  (AR 292).  Toxicology results showed Kallaus had the following levels of drugs and alcohol in his blood: .21 mg/L of duloxetine (Cymbalta), .03 mg/L of Oxazepam, an antianxiety medication, and .11 grams/L of alcohol. (AR 292, AR 295-296).

On February 4, 2009, the Coroner's Office made the final determination that Kallaus'
death was an accident caused by "acute combined drug effects," with additional pathological
diagnoses of microscopic myocardial infarct (heart attack) of the left ventricle, renal tubulitis,
severe fatty liver, and pulmonary edema.  (AR 288-289).  On March 12, 2009, Dr. Lee, Licking
County's Chief Forensic Pathologist, wrote to Ed Nelson with ICS/Merrill that Bradley Kallaus:

> died as the result of acute combined drug effects, specifically the elevated
> duloxetine [Cymbalta] level in conjunction with ethanol [alcohol]. The duloxetine
> level was approximately 4x greater than the upper limit of normal.  Bradley also
> had fatty changes in his liver and an acute infection in his right kidney.
> Medications are eliminated from the body through the liver and kidney and
> abnormalities in these organs may inhibit their typical metabolic functions. The
> decreased abilities of the liver and kidney to remove the medication from
> Bradley's system in an efficient manner allowed for the duloxetine to gradually
> increase to the level at which it was found at the time of death. The blood level of
> duloxetine does not change after death.

(AR 257).

### C.    Plaintiffs' Claim for Accidental Death Benefits

On January 13, 2009, Plaintiffs submitted separate claims for accidental death benefits
under the Plan as Kallaus' beneficiaries. (AR 272 -277).  Plaintiffs included with the claim, the
Licking County Coroner's report (AR 297-298), toxicology reports (AR 295-296), the autopsy
report (AR 290), and police reports (AR 278, 281-283).  The Plan's Claims Administrator, Star
Line Group ("Star Line"), investigated and processed Plaintiffs' claims and investigated the
circumstances surrounding Kallaus' death. (*See generally* AR 11, AR 41, AR 167-168, AR 258).
On April 22, 2008, the investigator for Star Line, Ms. Callahan, wrote to Plaintiffs to inform them
"that we are still working on obtaining the information required to complete our investigation of
the claim you filed."  (AR 167).

In reviewing the claim, Star Line considered all of the materials in the record, including

-5-

medical records from Kallaus' medical providers, Kallaus' prescription drug records, Kallaus'

death certificate, the Coroner's Autopsy report and other materials from the Coroner's Office, and

Kallaus' toxicology reports. (AR 22-40, AR 174-213, AR 257-288).  Star Line also obtained an

independent medical opinion from a forensic toxicologist, Stacy M. Borans, M.D., with Advanced

Medical Strategies.  The forensic toxicologist opined that the .21 mg/L of duloxetine (Cymbalta)

in Kallaus' blood was higher than average, and that based upon his weight of 151 pounds, it was

likely that Kallaus had ingested 150-700 mg of duloxetine (Cymbalta) immediately prior to his

death.  (AR 19-21).  "With respect to the Cymbalta and the levels reported, I would state that he

had probably taken 2-3X the prescribed amount (maximum 60 mg/day) to reach the level reported

in this case." (AR 21).  After reviewing all the information in the record, Star Line, on behalf of

the Plan and Nationwide Life Insurance Company, denied Plaintiffs' claims for accidental death

coverage by letter dated May 29, 2009.  (AR 15-AR 17).  Star Line's denial letter stated, in

pertinent part:

> The Death Certificate notes that Bradley Kallaus died from the combined 'use of
> ethanol and prescription medication.'  It was determined that the Immediate Cause
> of death was 'Acute Combined Drug Effects' with 'Hepatic Steatosis, Acute Renal
> Tubulitis' listed as Other Significant Conditions.  Medical records indicate that the
> deceased had a history of alcohol abuse and was being treated for depression,
> anxiety and hypertension among other diseases.
>
> *       *       *
>
> As noted above, the policy covers 'Injury caused by an Accident . . . which results
> independently of all other causes in a covered loss.' These requirements for
> coverage are not met given the Coroner's findings that death was caused by,
> among other things, excessive use of alcohol and prescription drugs. Additionally,
> in light of the Coroner's findings that the deceased suffered a heart attack several
> hours prior to death and that 'Hepatic Steatosis, Acute Renal Tubulitis' was a
> contribution cause of death, the loss is precludes from coverage by Exclusion 3
> and 8 noted above.  And, finally, since the Death Certificate indicates that the
> death was caused by the 'Acute Combined Drug Effects,' the loss is precluded

-6-

from coverage by Exclusion 11 noted above.

(AR 16).

The letter also informed Plaintiffs that they could appeal the decision by submitting a notice of appeal within 60 days of the decision and that they could submit any "comments documents, records, and other information relating to the claim" as part of their appeal. (AR 17). The letter further explained that the "[r]eview of the claim denial and the final decisions are the responsibility of Nationwide Life Insurance Company."  (AR 17).

On July 9, 2009, counsel for Plaintiffs submitted a letter to Star Line appealing the decision to deny accidental death benefits.  With the appeal, Plaintiffs requested a copy of the administrative record and a 60-day extension to submit evidence in support of the appeal.  (AR 12).  On July 14, 2009, Star Line responded to Plaintiffs' counsel, confirming receipt of his appeal letter, but failing to provide a copy of the administrative record or to respond to the request for an extension of time.  The letter stated that "A copy of your letter has been sent to Nationwide and any further correspondence will come directly from them."  (AR 11).  On July 23, 2009, having received no response from Nationwide, counsel for Plaintiffs wrote to Ms. Callahan:

> Thank you for confirming my request for an appeal and advising me that the matter had been turned over to Nationwide. Your letter did not, however, address two issues I raised in my letter, nor did it provide me with contact information for the individual at Nationwide handling this matter.
>
> My first request was for a 60-day extension of time to perfect our appeal. The extension is necessary because we do not have a copy of the administrative record, and we need to review that record before we know what additional evidence we might submit for review. The second request was [that] you send me a copy of the administrative record and the relevant insurance policy.
>
> Please respond to these requests. Thank you.

(AR 10).

-7-

On July 29, 2009, Mary Miller, the Secretary for the Nationwide Benefits Administrative Committee ("BAC") wrote to inform Plaintiffs' counsel that she had received the request for the appeal. She continued:

> The Committee looks at all of the evidence that is sent to them or gathered from the various places that the claim has been adjudicated. In some cases, before reaching a decision the Committee may ask for additional information or have the case sent for an outside review from a medical or other appropriate specialist. If you have any new information which is pertinent to the case, you are welcome to send it to me ….

(AR 09). With her letter, Ms. Miller included a copy of the administrative record that had been compiled to that point. With respect to the request for an extension of time, however, Ms. Miller wrote: "I am not permitted to extend the appeal filing deadline; however, since we will not hear this appeal until August 12, 2009, you may submit additional information as long as I receive it by August 7, 2009; otherwise it will not be considered." (*Id.*).

On August 25, 2009, counsel for Plaintiffs wrote a third time (by facsimile), again requesting an extension "until October 1, 2009 within which to present evidence in support of this appeal." (AR 04). Counsel noted: "In your July 29, 2009 letter you afforded us only 7 days within which to review the entire record, gather supporting evidence and submit a full appeal. Needless to say, we have not been able to meet your seven-day deadline." (*Id.*). Plaintiffs did not receive a response regarding the extension.

On August 12, 2009, the Plan Administrator of the Plan and the Benefits Administrative Committee ("BAC"), met to consider Plaintiffs' appeal. After reviewing the terms of the Plan and Policy, as well as all of the evidence in the Administrative Record, the BAC determined Kallaus' death was not accidental as defined by the terms of the Plan and Policy and affirmed the denial of benefits. (AR 06-08). In its letter communicating its decision to Plaintiffs (AR 01-03),

-8-

the BAC stated that, based on the circumstances of Kallaus' death, benefits were not payable

based on Policy exclusions for "sickness, disease, . . . or bodily infirmity," "cardiovascular

accident or event; myocardial infarction or heart attack; coronary thrombosis," and "voluntary

self administration of any prescription drug or controlled substance not prescribed by, or taken as

prescribed by, a Physician." (AR 02).  Applying these exclusions, the Committee wrote:

> Considering and weighing, the Coroner's Autopsy Report, as well as the
> Toxicology Report, and the letter by Dr. Lee as part of its decision, the Committee
> further determined that the requirements for receipt of AD&D benefits are not met
> in this case.  Since the Coroner's finding shows that Bradley Wade Kallaus' death
> was caused by, among other things, excessive use of alcohol and prescription
> drugs, since Mr. Kallaus showcased symptoms consistent with an acute myocardial
> infarct approximately 4-12 hours prior to death, and since "Hepatic Steatosis,
> Acute Renal Tubulitis" was shown to be a contributing cause of death, the
> Committee determined that the loss is excluded by Policy Exclusions 3 and 8
> noted above.

(AR 03).

The letter also informed Plaintiffs that this was the final decision of the administrative

review process and that they could bring a civil action under Section 502(a) of ERISA.  Plaintiffs

then initiated this action.

**D.      The Plan Language**

The relevant provisions of the Plan include:

**10.2.5 – How to Receive Death Benefits Under the Plan**

After your death, the beneficiary(ies) named by you will have to send a certified
copy of the death certificate to the Associate Service Center.  After Nationwide
receives the death certificate and all other requested information, Nationwide will
process the claim.

If one of your Dependents dies, you will need to contact the Associate Service
Center for claim forms and instructions.  You are the beneficiary of your
Dependents' death benefits and AD&D benefits.

Should you or your beneficiary(ies) not receive the benefits you or your beneficiary(ies) believe you are entitled to, you or your beneficiary(ies) have the right to file a written notice of claim with the Plan Administrator (see <u>Section 10.4</u>).

If your claim for benefits has been denied, you have the right to file an appeal (see <u>Section 10.5</u>).

(Doc. 15-1, Plan 07).

### 10.3 – Accidental Death & Dismemberment Benefit Program

\*      \*      \*

### How to Receive Accidental Death & Dismemberment Benefits Under the Plan

If you or one of your covered Dependents is injured as the result of an accident and suffer a permanent loss, you must notify the Associate Service Center of the loss in writing within 20 days or as soon as is reasonably possible.

Not every type of accident is covered by this AD&D coverage.  Benefits will not be paid if the insured dies or suffers a specific loss from a sickness, while committing a felony, suicide or other hazardous situations as listed below:

- Disease, or bodily infirmity, or mental infirmity, including the medical or surgical treatment or diagnosis of them;

- Ptomaine or bacterial infection unless resulting from an accident visible wound;

- Suicide or injury that the covered individual willfully caused;

- Participation in or any consequences of having participated in the commission of an assault or felony;

- Riding or driving in any race or speed contest, or testing any vehicle used in such race or speed contest, or participating in any way in the sport of parachute jumping, hang gliding or bungee jumping;

- War or any act of war, whether declared or undeclared;

- Any accident which occurs while on active duty in any armed forces of any country;

- Participation in a riot or insurrection;

- Travel or flight in or descent from any aircraft unless the insured person is
  either: (1) flying as a pilot or member of the crew of any Nationwide
  owned or operated airplane, or (2) a civilian passenger on any civilian
  aircraft having a current and valid airworthiness certificate and piloted by a
  person who then holds a valid and current certificate of competency of a
  rating authorizing him/her to pilot such aircraft or a transport type aircraft
  operated by the U.S. Military Air Command or similar air transport service
  of any country recognized by the U.S. Government; or

- No coverage is provided on an aircraft operated for the purpose of
  acrobatic flying, aerial photography, banner towing, endurance tests,
  exploring, fields crop dusting, fire fighting, herding, hunting, outer space
  travel, patrolling, pipe and power line inspecting, racing, seeding, spraying,
  stunt flying or any test or experimental activity.

*       *       *

(Doc. 15-1, Plan 08-11).

The relevant portions of the Policy include:

### SECTION I – DEFINITIONS

Accident – means an unintended or unforeseeable event or occurrence which
happens suddenly and violently.

(Doc. 15-2, Policy 09).

### SECTION X – EXCLUSIONS

No benefit will be paid for any loss resulting in whole or part from, or contributed
to by, or as a natural or probable consequence of any of the following even if the
immediate cause of the loss is an accidental bodily injury:

1.   Suicide or any attempt at suicide while sane or insane.

2.   Intentionally self-inflicted injury while sane or insane, including any form
     of auto-eroticism.

3.   Sickness, disease, mental incapacity or bodily infirmity whether the loss
     results directly or indirectly from any of these.

4.   The medical or surgical treatment of sickness, disease or bodily infirmity

-11-

whether the loss results directly or indirectly from the treatment, including but not limited to cosmetic surgery and gastric bypass surgery.

5.    Infections of any kind, regardless of how contracted, including as the result of surgery, except bacterial infection that is the direct result of an accidental cut or wound independent and in the absence of any underlying sickness, disease or condition, including but not limited to diabetes.

6.    Travel or flight (including getting in or out, on or off) in any aircraft or device which can fly above the earth's surface, unless the Company has agreed as otherwise provided in Section IX of this Policy:

    a)    if such aircraft is being used:
- for aerobatics or stunt flying, racing or endurance tests, crop dusting, seeding, fertilizing, or spraying, fire fighting, any exploration, pipe or power line patrol, traffic patrol, the pursuit of animals or birds, aerial photography, banner towing, skywriting, recreational sports, or test or experimental purposes;
- when a special permit or waiver from the proper authority having jurisdiction over civil aviation has to be issued; for travel, or is designed for travel, beyond the earth's atmosphere;
- by or for any military authority.  (Aircraft flown by the United States Air Force Air Mobility Command (AMC) or similar service of another country are not excluded); or
- by or for the Policyholder.  (This exclusion applied whether the aircraft or device is *Owned*, *Controlled* or *Leased*, as defined.  *Chartered Aircraft*, as defined, are not excluded).

    b)    if the Covered Person is riding as a passenger in such aircraft or device if it:
- is not intended or licensed for the transportation of passengers;
- does not have a current/valid airworthiness certificate; or
- is being piloted by a person who does not hold a current/valid medical and pilot certificate with the appropriate ratings for the aircraft.

    c)    if the Covered Person is:
- serving as pilot or crew member (or student taking a flying lesson);
- hang-gliding; or
- parachuting except when necessary to make a parachute

-12-

jump for self-preservation.

7.     Full-time active duty in the armed forces of any country or international authority.  (Reserve duty in an organized U.S. Military Reserves or the National Guard for up to 30 days is not excluded.)

8.     Aneurysm, stroke or cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack; coronary thrombosis.

9.     Commission of or attempt to commit a crime.

10.    The voluntary inhalation of poisonous gases or solvents.

11.    Voluntary self-administration of any prescription drug or controlled substance not prescribed by, or not taken as prescribed by, a *Physician* or taken in accordance with the manufacturers recommended dosage or any over the counter medication not taken in accordance with the manufacturers recommended dosage.  (Accidental ingestion of a poisonous food substance is not excluded.)

12.    The *Covered Person* being deemed and presumed, under the law of the locale in which the *Injury* is sustained, to be driving or operating a motor vehicle while under the influence of alcohol or intoxicating liquors.

13.    Declared or undeclared War, nuclear reaction or nuclear radiation.

(Doc. 15-2, Policy 23-24).

**E.    Procedural History**

This case was initiated on October 13, 2009.  Both parties moved for judgment on the administrative record.  The Court issued its Opinion and Order on November 3, 2010, concluding that the BAC should have granted Plaintiffs an extension of the appeal time to supplement their appeal with an expert report.  (*See* Doc. 26).  Accordingly, the Court remanded the case to the Plan Administrator, directing that Plaintiffs be afforded time to supplement their appeal and that their claim be reconsidered.

On December 9, 2010, the BAC notified Plaintiffs' counsel that it was providing Plaintiffs

an additional opportunity to supplement their appeal based on the Court's determination.  (AR 319).  On February 7, 2010, Plaintiffs' counsel forwarded a copy of the expert opinion and curriculum vitae of their expert, Dr. Marc Cooperman, a surgeon with the Veteran's Administration Care Center in Columbus, to the BAC.  (AR 304-318).  Dr. Cooperman opined that Kallaus' death was an "accidental death due to a consequence of prescribed medication taken in the prescribed manner coupled with the moderate usage of alcohol."  (AR 308).

On March 1, 2011, the BAC again denied Plaintiffs' claim for benefits.  (AR 299-303).  The BAC considered all of the evidence in the record, including Dr. Cooperman's expert report.  It did not find Dr. Cooperman's report persuasive, and outlined several bases for that conclusion.  (AR 302).  On January 11, 2012, Plaintiffs filed a Motion to Reopen this case (Doc. 28).  On February 10, 2012, the Court granted Plaintiffs' Motion and reopened the case (Doc. 29).  After the administrative record was supplemented, both parties again moved for judgment on the administrative record.  Those motions are now ripe for review.

## II.    STANDARD OF REVIEW

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the United States

Supreme Court held that a denial of benefits challenged under § 1132 (a)(1)(B) is to be reviewed

under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan, in which case

the more deferential arbitrary and capricious standard of review applies. The parties agree that

this Court should apply the arbitrary and capricious standard of review.

The arbitrary and capricious standard is the least demanding form of judicial review of

administrative action. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir.

2003). Under the arbitrary and capricious standard, a determination by the plan administrator will

be upheld if it is rational in light of the plan's provisions. *Id.*; *Yeager v. Reliance Standard Life

Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996). When it is possible to offer a reasoned explanation for

a plan administrator's decision based upon the evidence, that decision is not arbitrary and

capricious. *McDonald*, 347 F.3d at 169; *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d

689, 693 (6th Cir. 1989). However, a district court's obligation to review the administrative

record "inherently includes some review of the quality and quantity of the medical evidence and

the opinions on both sides of the issues" to avoid becoming "nothing more than rubber stamp for

any plan administrator's decision[.]" *McDonald*, 347 F.3d at 172. The Court is "entitled to take

into account the existence of a conflict of interest that results when . . . the plan administrator who

decides whether an employee is eligible for benefits is also obligated to pay those benefits . . . ."

*Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006). Moreover, the Sixth Circuit has instructed:

"to the extent that the [Plan's] language is susceptible of more than one interpretation, [a court

-15-

should] apply the 'rule of *contra proferentum*' and construe any ambiguities against . . . the drafting parties." *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846-47 (6th Cir. 2000) (citing *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 n.7 (6th Cir. 1998)).

In determining whether a decision was arbitrary and capricious, the Court factors in whether a conflict of interest exists. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 2346 (2008). A conflict of interest exists when, as in this case, an insurance company is both the administrator rendering eligibility determinations and the insurer responsible for paying the benefits out of its own pocket. *Id*, 128 S. Ct. at 2346. The Court "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits[,] and ... the significance of the factor will depend upon the circumstances of the particular case." *Id.*, 128 S. Ct. at 2346. A conflict of interest has greater importance "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," and has less importance "where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.*, 128 S. Ct. at 2351. The record contains no evidence to suggest that Nationwide has a history of biased claims administration or that it has taken steps to reduce the potential for bias or to promote accuracy. Accordingly, the Court gives Nationwide's conflict of interest neither greater nor lesser weight and simply considers it as one factor in determining whether it arbitrarily and capriciously denied Plaintiffs' claim for benefits.

In reviewing the administrator's decision, the court is limited to a consideration of the evidence which was included in the record before the plan administrator. *See Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health & Welfare Trust Fund*, 203 F.3d 926, 932 (6th Cir. 2000); *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).

With respect to the burden of proof, Plaintiffs bear the burden of establishing that Bradley's death was an accident within the meaning of the Plan. *Cooper v. Unum Life Ins. Co. of America*, 2010 U.S. Dist. LEXIS 141525 (E.D. Tenn. Nov. 16, 2010), citing *Rose v. Hartford Fin. Servs. Group, Inc.*, 268 Fed. Appx. 444, 452 (6th Cir. 2008), and *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 Fed. Appx. 511, 516 n. 4 (6th Cir. 2006). The BAC, however, relies on Plan exclusions as a basis for the denial of benefits, therefore the BAC bears the burden of proving, by a preponderance of the evidence, that the exclusions apply. *See Cooper*, 2010 U.S. Dist. LEXIS 141525, citing *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992); and *Miller v. United Welfare Fund*, 72 F.3d 1066, 1074 (2d Cir. 1995). Moreover, the BAC's burden of proof extends to the question of causation–it must demonstrate by a preponderance of the evidence not only that a condition enumerated within one of its exclusions existed, but that the condition was the proximate cause of Bradley's death. *See Cornish v. U.S. Life Ins. Co. of City of New York*, 2009 U.S. Dist. LEXIS 92326 (W.D. Ky. Sept. 30, 2009) (under applicable policy language, "Defendant insurance companies bear the burden to establish a causal relationship between the intoxication of the [decedent] and her resulting death by drowning"); *see also Loan v. Prudential Ins. Co. of America*, 370 Fed. Appx. 592, 596 (6th Cir. 2010) ("After all, if a claimant is intoxicated while standing on a porch, the porch collapses, and he falls to his death, it cannot be

said that his death has resulted from being legally intoxicated.").

## III.    DISCUSSION

Plaintiffs assert that they have met their burden of proving that Bradley's death was an accident and Defendants' denial of their claim for benefits was arbitrary and capricious. Defendants, however, maintain that they did not act in an arbitrary and capricious manner in denying Plaintiffs' claim because the cause of Bradley Kallaus' death falls under an exception to the Plan.

### A.    Accident

Plaintiffs have filed a claim under their son Bradley Kallaus' accidental death policy. Therefore, to qualify for benefits, Plaintiffs must first establish that Bradley's death was an accident.  The Policy provides that "[t]he Company agrees to insure eligible persons who are within the covered class(es) listed in the Policyholder's Application, who have enrolled for coverage, and for whom the required premiums are paid when due against *Injury* caused by an *Accident* covered by this Policy."  (Policy 007).  "Injury" is defined as "bodily injury caused by the direct result of an *Accident* occurring while a Covered Person's coverage is in effect under this Policy which results independently of all other causes in a covered loss."  (Policy 010). "Accident" is defined as "an unintended or unforeseeable event or occurrence which happens suddenly and violently."  (Policy 009).

Both the coroner and Plaintiffs' expert Dr. Cooperman concluded that Bradley's death was an accident.  The BAC appears to have reached the same conclusion because its' decision relies instead on policy exclusions.  (AR 300-301) (acknowledging Dr. Cooperman's opinion that Bradley's death was an accident but adding, "however, the Committee does not believe that Dr.

-18-

Cooperman took into account the Policy Exclusions specifically."). Further, Defendants do not appear to contest whether Bradley's death was an accident within the meaning of the Plan, but instead focus on the exclusions. The Court therefore finds that Bradley Kallaus' death was an accident as defined by the Plan, as it was an unintended or unforeseeable event. However, the Plan and Policy do not cover all injuries, incidents or occurrences that might generally be referred to as an accident. The BAC's decision denying benefits was based on the exclusions in the policy. Therefore, the Court will turn to the applicable exclusions.

### B.    Exclusions

There are a number of express exclusions set forth in the Policy. The following exclusions are relied upon by Defendants in denying Plaintiffs' claim:

> No benefit will be paid for any loss resulting in whole or in party from, or contributed to by, or as a natural or probable consequence of any of the following even if the immediate cause of the loss is an accidental bodily injury:
>
> *        *        *
>
> (3) Sickness, disease, . . . or bodily infirmity, whether the loss results directly or indirectly from any of these.
>
> *        *        *
>
> (8) Aneurysm, stroke or cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack; coronary thrombosis.
>
> *        *        *
>
> (11) Voluntary self-administration of any prescription drug or controlled substance not prescribed by, or not taken as prescribed by, a Physician or taken in accordance with the manufacturers recommended dosage. *        *        *

(Policy 023-024; Plan 010).

-19-

Defendants assert that Bradley's death resulted from or was contributed to by several factors, including the combined effects of using alcohol with prescription drugs, having a dangerously high level of duloxetine (Cymbalta) in his system, liver and kidney disease, and a heart attack.  Plaintiffs, however, argue that Defendants' application of the aforementioned exclusions was arbitrary and capricious.  Additionally, Plaintiffs assert that Defendants 'shotgun' approach of tossing out three exclusions and hoping that the Court finds one acceptable is not sufficient to meeting their burden of proof.  Each of the exclusions will be discussed in turn.

### 1.    Sickness or Disease and Prescription Drugs

Defendants assert that Plaintiffs are not entitled to accidental death benefits under the Policy because Bradley's death resulted, in part, from liver and kidney disease, and the fact that he took prescription medication not as prescribed.  Defendants rely on Bradley's death certificate which states that the cause of death was "acute combined drug effects."  (AR 269).  The death certificate further states that the death occurred because of his "use of ethanol and prescription medication."  (*Id.*).  Defendants assert that the liver and kidney problems were self-induced from excessive alcohol use over many years.  Additionally, Bradley's death certificate lists both hepatic steatosis and acute renal tubulitis under "Other Significant Conditions Contributing to Death", which are commonly referred to as fatty liver and kidney disease.  Dr. Lee stated that because of the fatty liver and kidney disease, Bradley was unable to efficiently eliminate medications from his body, causing them to build up in his body until the duloxetine reached lethal levels.  (AR 257).   Dr. Herbert wrote that Bradley's liver injury resulted from his alcohol use.  (AR 187).  Based on these findings, Defendants denied Plaintiffs' benefits concluding that Bradley's death was significantly contributed to by fatty liver and kidney disease.

At the time of his death, Bradley had .21 g/ML of duloxetine (Cymbalta) in his blood and his blood alcohol content was .11 g/L.  Dr. Lee, Licking County's Chief Forensic Pathologist, opined that the amount of duloxetine was four times more than what is considered the absolute upper limit of normal.  (AR 257).  The blood alcohol level was significantly more than the permissible level to operate a motor vehicle in the State of Ohio, less than .08 g/L.  The independent toxicologist retained by Star Line opined that based on Bradley's weight and the amount of duloxetine found in his blood stream, he likely ingested 150-700 mg of duloxetine prior to his death, that is 2-3 times the maximum amount of duloxetine that had been prescribed to safely take in one day.  (AR 21).  Based on this information, Defendants denied Plaintiffs' claim based on Policy exclusion #11, for prescription medications not taken as prescribed.

Plaintiffs, however, argue that Defendants reliance on exclusions 3 and 11 are internally inconsistent.  Plaintiffs assert that Defendants have not resolved the questions of "Why was the level of duloxetine in Bradley's blood 'higher than average'? And was the high level of duloxetine itself a cause of Bradley's death?"  (Pls' Mot. at 16).  Plaintiffs assert that the evidence on these issues is mixed and that the BAC made no effort to resolve them.  Plaintiffs argue that it is Defendants burden to prove, by a preponderance of the evidence, that a particular exclusion applies, and it is not sufficient for them to simply toss up three exclusions and hope the Court finds one of them acceptable.

There does appear to be some confusion as to whether Bradley Kallaus took an overdose of his medication or his liver and kidneys did not properly metabolize the medication.  Plaintiffs assert that both cannot be true, yet Defendants suggest that it is possible that his years of alcohol abuse caused damage to his liver and kidneys, and that this damage and an overdose of duloxetine

-21-

both contributed to his death.  Defendants further state that any exclusion precludes accidental death benefits and Plaintiffs cannot show that none of the exclusions apply.

There is nothing in the Policy, nor any cases cited by Plaintiffs, to support their argument that Defendants cannot rely on multiple exclusions of the Policy, even if they appear contradictory.  The key language that this Court must focus on from the Policy is: "No benefit will be paid for any loss resulting *in whole or in part from, or contributed to by*, or as a natural or probable consequence of any of the following even if the immediate cause of the loss is an accidental bodily injury." (Emphasis added).  In *Ann Arbor Trust Co. v. Canada Life Assur. Co.*, the decedent fell down the stairs and cut his head. At first the wound healed normally, but later he began to manifest signs of internal hemorrhaging.  He was diagnosed with a blood disorder and later died.  The cause of death was advanced cirrhosis of the liver caused by decedent's alcohol consumption.  Two physicians opined that, but for the cirrhosis of the liver, decedent's fall and resulting injury would not have caused his blood disorder and resulting death.  Dispositive for the court was the explicit language of the policy excluding death caused even in part by disease. When an insurance policy contains such clear exclusionary language, the inquiry is "limited to determining if the accident alone was sufficient to cause death directly and independently of disease."  810 F.2d 591, 593 (6th Cir. 1987).

Based on the aforementioned analysis, Plaintiffs, in the case at bar, cannot establish that the decision to deny benefits was arbitrary and capricious in view of the exclusions cited by Defendants.  There is no evidence to dispute that Bradley's fatty liver and kidney disease did not contribute to his death.

Plaintiffs reliance on *Stischok v. Hartford Life Group Ins. Co.*, 2008 U.S. Dist. LEXIS 25424 (S.D. Ohio Mar. 31, 2008), *Jessen v. CIGNA Group, Inc.*, 812 F. Supp. 2d 805 and *Gower v. AIG Claim Servs.*, 501 F. Supp. 2d 762 (N.D. W. Va. 2007), does not change the aforementioned conclusion.  In *Stischok*, the decedent died from consuming too much alcohol, there were no drugs in his system, nor was there any evidence of a preexisting sickness or disease like Bradley.  The BAC did not rely upon an alcohol exclusion or deny benefits solely on Bradley's alcohol abuse.  Therefore, *Stischok* is not applicable.  Further, *Jessen* and *Gower* are more on point involving drugs, however, they are still distinguishable because the courts applied de novo review, as opposed to the arbitrary and capricious standard in this case.

Accordingly, the Court finds that the BAC properly applied Exclusions 3 and 11 to deny accidental death benefits to Plaintiffs.  Therefore, the BAC's decision was not arbitrary and capricious.

### 2.    Heart Attack

In addition to Exclusions 3 and 11, the BAC also determined that Exclusion 8 was applicable because the Coroner determined that Bradley had suffered a heart attack just hours before his death.  (AR 291).  The autopsy included findings "consistent with an acute myocardial infarct of approximately 4-12 hours in age."  (AR 291).   The Policy excludes accidental death benefits for death that is caused by a "cardiovascular accident or event; myocardial infarction or heart attack. . .."  (POLICY 023-024).

Plaintiffs, however, argue that there is no medical evidence that the infarct caused Bradley's death.  Dr. Cooperman opined that the drug interaction that caused the death, likely caused the infarct.  Further, Plaintiffs suggest that not every heart attack leads to death.

Again, the relevant language that this Court must consider is that benefits will not be paid under the Policy "for any loss resulting *in whole or in part from, or contributed to by*, or as a natural or probable consequence of any of the following even if the immediate cause of the loss is an accidental bodily injury."  (Emphasis added).

Again, Plaintiffs seem to suggest, but have not sufficiently established, that Defendants cannot rely on multiple exclusions.  As the introductory language to the exclusions section of the Policy suggests, there could be multiple contributors to someone's death.  The BAC's application of these exclusions was rational based on the evidence in the administrative record.  Accordingly, the BAC's decision was not arbitrary and capricious.

### C.      Advice of Competent Medical Expert

Plaintiffs argue that Defendants' decision was arbitrary and capricious *per se* because they failed to seek the advice of a competent medical expert in assessing Bradley's appeal, *citing Loan v. Prudential Ins. Co. of America*, 370 Fed. Appx. 592 (6th Cir. 2010).  In *Loan*, the Sixth Circuit held that a claim fiduciary who failed to consult on appeal with a qualified medical expert, as required by a Department of Labor regulation, acted arbitrary and capriciously in denying a claim for accidental death benefits.  However, the Department of Labor regulation, 29 C.F.R. 2560.503-1(h)(3)(iii) only applies to group health plans and disability benefit plans, not to the claim at issue here.  *See Karl v. Asarco, Inc.*, 2004 U.S. Dist. LEXIS 25956, *36 (S.D.N.Y. Dec. 23, 2004) (§2560.503-1(h)(3) only applies to group health and disability plans).

Even if Defendants were required to consult a medical expert, they argue that the BAC has a medical expert, Dr. Michael Moore, who was present at every meeting.  Further, Dr. Stacy M. Borans, a board certified forensic toxicologist and member of the American Society of Forensic

-24-

Toxicology, reviewed the file and provided her independent expert medical opinion to the BAC. Accordingly, the Court again finds that the BAC did not act arbitrarily and capriciously.

In conclusion, the Court finds that the evidence in this case establishes that there was a rational basis for the BAC's decision applying the three Policy exclusions and denying Plaintiffs' claim for accidental death benefits.  Therefore, the BAC's decision is not to be disturbed under the arbitrary and capricious standard of review.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Administrative Record is **DENIED** and Defendants' Motion for Judgment on the Administrative Record is **GRANTED**.

The Clerk is instructed to remove Documents 33 and 35 from the Court's pending motions list.

The Clerk is further instructed to remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**

-25-